1
2
3
4
5
6
7
8
9
10

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SITE UPDATE SOLUTIONS, LLC,     ) | Case No.: 11-3306 PSG |
|     ) | **ORDER DENYING DECLARATION** |
|     Plaintiffs,     ) | **OF EXCEPTIONAL CASE AND** |
|     v.     ) | **AWARD OF ATTORNEYS' FEES** |
|     ) | |
| ACCOR NORTH AMERICA, INC., et al,     ) | **(Re: Docket No. 649)** |
|     ) | |
|     Defendants.     ) | |

In this patent infringement case, Defendant Newegg Inc. ("Newegg") moves to declare this case exceptional and for an award of attorneys' fees pursuant to 35 U.S.C. § 285. Plaintiff Site Update Solutions, LLC ("SUS") opposes. The parties appeared for a hearing. Having carefully considered the parties' papers and oral arguments, the court DENIES Newegg's motion.

## I.      BACKGROUND

This case originated in the Eastern District of Texas in May 2010 when SUS filed suit against Newegg and thirty-four other defendants.[1] In its complaint, SUS alleged that the various

---

[1] *See* Docket No. 209. The other named defendants were Accor North America, Inc., Adobe Systems Incorporated, Amazon.com, Inc., American Broadcasting Companies, Inc., CBS Interactive Inc., CDW, Choice Hotels International, Inc., CNN Interactive Group, Inc., Deli Management, Inc., Daily News L.P., Electronic Arts, Inc., Enterprise Rent-A-Car Company, Facebook, Inc., Gannett Satellite Information Network, Inc., HSN, Inc., Intuit, Inc., Linkedin Corporation, Monster Worldwide, Inc., Myspace, Inc., MSNBC Interactive News LLC, NBC Universal, Inc., Nissan North America, Inc., Office Max, Inc., Overstock.com, Inc., Red Hat, Inc.,

**United States District Court**
For the Northern District of California

defendants infringed on United States Reissue Patent No. RE40,683 ("RE'683 Patent"), a reissue of United States Patent No. 6,253,198, titled "Process for Maintaining Ongoing Registration for Pages on a Given Search Engine."[2]

The case arrived in this court on July 6, 2011, following an order on June 8, 2011 from the Eastern District of Texas granting a request to change venue.[3]  The defendants[4] first requested the transfer on November 3, 2010, noting in particular that several search engine companies with evidence relevant to the case fell within the jurisdiction of the Northern District of California.[5]  In its two-page opposition, SUS stated that it "disagree[d] with the contentions and allegations made in the Motion to Transfer" and pointing to the speed with which the Eastern District of Texas could move the case to trial in comparison to this district.[6]  But SUS concluded that it was "agreeable to the transfer if the Court deems that such transfer is in the interests of justice of all the parties."[7]

In the seven months between the request and the district court's order, the parties moved forward toward claim construction, which the court had set for July 13, 2011.[8]  The parties jointly sought extension of the claim construction deadlines on March 7, 2011 and the district court, granting the request, moved the claim construction hearing back to August 3, 2011.[9]  SUS,

---

Salesforce.com, Inc., Sears, Roebuck and Co., Staples, Inc., Starwood Hotels & Resorts Worldwide, Inc., Target Corporation, Thomson Reuters Holdings, Inc., Ticketmaster LLC, Time, Inc., Wal-Mart Stores, Inc., and Wyndham Worldwide, Inc.  *See id.*

[2] *See id.*

[3] *See* Docket No.

[4] Enterprise Rent-A-Car Company, CDW LLC, and Wal-Mart Stores, Inc. did not join the motion but they did not oppose transfer.  *See* Docket No. 503.

[5] *See* Docket No. 373.

[6] Docket No. 410.

[7] *See id.*

[8] *See* Docket No. 357 Ex. 1.

[9] *See* Docket Nos. 467, 468.

Case No.: 11-3306 PSG
ORDER

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

however, opposed the defendants' subsequent request to vacate altogether the claim construction hearing until the motion to change venue was resolved.[10]  The district court denied the request to vacate the dates, finding that the claim construction preparation could follow the case to this district if the motion was granted but that if the hearing was vacated and the transfer request denied, the case would be unnecessarily delayed.[11]  Pursuant to the court's order, the parties filed their claim construction briefs and a motion for summary judgment before the district court's order granting the transfer request.[12]

Throughout the litigation, SUS regularly dismissed defendants, beginning with MSNBC Interactive News LLC in mid-October 2010.[13]  From the end of 2010 until July 2012, SUS dismissed fourteen defendants,[14] at least nine of which were subject to settlement agreements between SUS and the individual defendants.[15]  The amounts of those settlement agreements ranged from ████████████.[16]

Once the case moved to this court, the parties again filed their claim construction briefs and sought construction of twelve terms.[17]  The court held a tutorial on July 13, 2012[18] and a claim

---

[10] *See* Docket No. 476.

[11] *See* Docket No. 480.

[12] *See* Docket Nos. 494, 499, 500, 501.

[13] *See* Docket No. 355.

[14] *See* Docket Nos. 372 (Salesforce.com on Oct. 29, 2010), 380 (Accor North America, Inc. on Nov. 11, 2010), 415 (Office Max, Inc. on Dec. 3, 2010), 429 (Wyndham Worldwide Corp. on Jan. 5, 2011), 432 (Thomson Reuters Holdings, Inc. on Jan. 6, 2011), 433 (Nissan North America, Inc. on Jan. 7, 2011), 451 (Deli Management, Inc. on Jan. 20, 2011), 489 (Starwood Hotels & Resorts Worldwide, Inc. on May 6, 2011), 490 (Red Hat, Inc. on May 6, 2011), 537 (MySpace, Inc. on Aug. 22, 2011), 538 (Monster Worldwide, Inc. on Aug. 22, 2011), 572 (Wal-Mart Stores, Inc. on Dec. 6, 2011), 600 (CDW on Apr. 24, 2012), 611 (HSN, Inc. on July 6, 2012).

[15] *See* Docket No. 649 Exs. B – J.

[16] *See id.*

3

Case No.: 11-3306 PSG
ORDER

United States District Court
For the Northern District of California

construction hearing on July 20, 2012.[19]   At the hearing, the court issued its constructions from the

bench.[20]   As part of its construction, the court declined to construe four of the terms, citing

concerns that the terms were indefinite.[21]   The court then invited the defendants to move for

summary judgment on indefiniteness grounds.[22]

Following the claim construction hearing, SUS and all of the remaining defendants except

for Newegg stipulated to a dismissal of all claims brought by SUS.[23]   Newegg refused to dismiss

its declaratory relief counterclaims and indicated that it would file a summary judgment motion in

line with the court's suggestion.[24]   On October 18, 2012, SUS filed a motion to dismiss its claims

with an accompanying covenant not to sue to end the dispute between the parties.[25]   Newegg

opposed SUS's motion because it believed the covenant not to sue was inadequate to protect

against future suit by SUS.[26]   Following SUS's amendment of the covenant not to sue, Newegg and

SUS agreed to dismiss the claims between them.[27]

---

[17] *See* Docket Nos. 603, 605, 607.

[18] *See* Docket No. 618.

[19] *See* Docket No. 619.

[20] *See* Docket No. 632 at 153:3-10.  The court assured the parties that an order with its reasoning would precede any entry of judgment.  *See id.*

[21] *See id.* at 157:5-15.

[22] *See id.* at 157:16-19.

[23] *See* Docket No. 624 (Amazon.com Inc., American Broadcasting Companies, Inc., CBS Interactive Inc., Choice Hotels International, Inc., CNN Interactive Group, Inc., Daily News L.P., Electronic Arts, Inc., Enterprise Rent-A-Car Company, Facebook, Inc., Gannett Satellite Information Network, Inc., Home Box Office, Inc., Intuit Inc., Linkedin Corporation, NBC Universal, Inc., Newegg, Inc., Overstock.com, Sears, Roebuck and Co., Staples, Inc., Target Corporation, Ticketmaster L.L.C., and Time Inc. on Aug. 13, 2012).

[24] *See* Docket No. 623.

[25] *See* Docket No. 642.

[26] *See* Docket No. 645.

Case No.: 11-3306 PSG
ORDER

Newegg then filed this motion requesting the court to determine this case exceptional and to award Newegg its attorneys' fees.

## II.   LEGAL STANDARDS

Although under the traditional "American rule" parties to litigation are responsible for their own legal costs and fees,[28] Congress determined that in certain "exceptional cases" the court may award to the prevailing party "reasonable attorney fees."[29]  The statute does not define what an "exceptional case" is, but the Federal Circuit has established two instances in which a party's behavior may transform an ordinary case into an "exceptional" one, specifically when a party either engages in litigation misconduct or pursues a "frivolous claim."[30]  If the court determines that the case is "exceptional" under one of the two criteria, it must then ascertain "whether an award of attorneys' fees is appropriate and, if so, the amount of the award."[31]  "The amount of the attorney fees awarded depends on the extent to which the case is exceptional."[32]  "To receive attorney fees under § 285, a prevailing party must establish by clear and convincing evidence that the case is exceptional."[33]

## III.   DISCUSSION

Newegg primarily accuses SUS of pursuing frivolous claims that were both objectively baseless and brought in bad faith.  Newegg also points to other behavior by SUS during the

---

[27] *See* Docket No. 646.

[28] *See Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 711 F.3d 1341, 1345 (Fed. Cir. 2013).

[29] *See* 35 U.S.C. § 285.

[30] *See Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1308 (Fed. Cir. 2012).

[31] *Id.*

[32] *Id.*

[33] *Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 711 F.3d 1341, 1346 (Fed. Cir. 2013).

Case No.: 11-3306 PSG
ORDER

United States District Court
For the Northern District of California

litigation in what appears to be an argument that SUS engaged in litigation misconduct.[34]  The court thus considers whether the case is exceptional under both prongs.

## A.      Frivolous Claims

To be "frivolous," a claim must meet two criteria: (1) it must be "brought in subjective bad faith" and (2) it must be "objectively baseless."[35]  "To be objectively baseless, the infringement allegations must be such that no reasonable litigant could reasonably expect success on the merits."[36]  To satisfy the subjective prong, the prevailing party must show "that [the] lack of objective foundation for the claim was either known or so obvious that it should have been known by the party asserting the claim."[37]  "[T]here is a presumption that an assertion of infringement of a duly granted patent is made in good faith" and so the subjective prong "must be established with clear and convincing evidence."[38]

Newegg asserts that SUS's infringement claims were objectively baseless because they ignored "well-established" means-plus-function law in arguing for its constructions.  For the subjective prong, Newegg points to the settlements and dismissals with other defendants earlier in the case to argue that SUS sought "nuisance, shake-down" settlements, which, according to Newegg, evince its bad faith in bringing the claims.  SUS unsurprisingly disputes both of these arguments, asserting that its positions during claim construction were reasonable given the complicated issues involved in the construction and that the settlements reflect only its right to pursue royalties from infringers.

---

[34] Newegg offers these other actions as evidence of subjective bad faith, but the conduct does not fall within the framework that the Federal Circuit has established for the "frivolous claim" basis for an exceptional case finding. *See Checkpoint Sys., Inc.*, 711 F.3d at 1346.  The court therefore considers the conduct under the litigation misconduct prong.

[35] *Id.*

[36] *Id.*

[37] *Id.* (internal quotations and citations omitted).

[38] *Id.* at 1309.

6

Case No.: 11-3306 PSG
ORDER

The court begins with an evaluation of SUS's positions during claim construction and in alleging infringement.  The merits of SUS's arguments and claims necessarily color the settlements it reached with other defendants and whether bad faith may be inferred from those agreements.

### 1.     Claim Construction

To ascertain the legitimacy of SUS's position, the court must engage in a type of "meta-claim construction."[39]  Because the court did not have the opportunity to issue a complete claim construction opinion before all claims were dismissed, it must explain here why it construed the terms in the manner in which it did before it can explain the merit, or lack thereof, of SUS's arguments.  Rather than present an entire claim construction analysis, against which it also has to determine the validity of SUS's arguments, the court limits itself to explaining its construction of the terms for which Newegg challenges SUS's positions.  But first, the court provides the background of the claim construction and the claim at issue.

SUS pursued an infringement claim against the defendants for only Claim 8 of the RE'683 Patent.[40]  The parties agreed that Claim 8 was a means-plus-function claim under 35 U.S.C. § 112(6).[41]  Claim 8 describes:

> An apparatus for updating an internet search engine database with current content from a web site, comprising:
>
> > a means for creating and modifying a database of a web site wherein said website database contains content capable of being indexed by an internet search engine;
> >
> > a means for identifying, using said web site database, new, deleted, [unmodified] or modified content;

---

[39] *See Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1319 (Fed. Cir. 2011)(noting that without an explanation of the claim construction determinations, an exceptional case finding on grounds that positions during claim construction were baseless is not supported); *see also Eon-Net LP v. Flagstar Bancorp*, 249 Fed. Appx. 189, 198 (Fed. Cir. 2007) (remanding to district court for "full claim construction analysis" to determine whether position was baseless).

[40] *See* Docket Nos. 605, 607.

[41] *See* Docket Nos. 605, 607.

Case No.: 11-3306 PSG
ORDER

United States District Court
For the Northern District of California

a means for transmitting to said internet search engine a set of indices, wherein said set of indices comprises said new, deleted, unmodified or modified database content;

a means for opening, by a user, a form on a computer to enable or disable internet search engines to be updated with information;

a means for enabling or disabling, by said user, the appropriate internet search engines on said form;

a means for submitting, by said user, said information to a script;

a means for parsing, through the user of said script, said information from said form; and

a means for updating, through the use of said script, said database of search engine.[42]

The parties sought construction of twelve terms from the claim. At issue in this motion, however, are only seven terms for which Newegg asserts SUS's positions were "objectively baseless":

| Term | SUS Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "information" | Plain meaning | Indefinite because it is used in the claim in a contradictory and irreconcilable way |
| "website database" | Record of resources on the website | Structure of fields or records built by software that catalogues the resources of a website, other than the resources themselves |
| "a means for creating and modifying a database of a website where in said website database contains content capable of being indexed by an internet search engine" | Function: creating and modifying a database of a web site wherein said website database contains content capable of being indexed by an internet search engine<br><br>Structure: The combination of a web server, Common Gateway Interface script, website database and form and equivalents | Function: creating and modifying a database of a web site wherein said website database contains content capable of being indexed by an internet search engine<br><br>Structure:<br>(i) a website server or surrogate website server; (ii) the Table of Files, which is a field in the Table of Search Engines (as described at 6:51–7:18; 7-29-50); and (iii) the disclosed server algorithm, which: (1) builds the Table of Files list containing |

---

[42] *See* Docket No. 605 Ex. A.

Case No.: 11-3306 PSG
ORDER

United States District Court
For the Northern District of California

| | | records that store URLs that are obtained from either (a) a manually entered list; (b) a specified map page; or (c) a spider crawling from specified entry points of the web site; and (2) modifies records in the Table of Files list when content is added, altered, or removed (all as described at 7:55-8:13 and Fig. 1a, boxes 203a-c, 204a-c, and 206b-c). |
|---|---|---|
| "a means for identifying, using said web site database, new, deleted, or modified content" | Function: identifying, using said web site database, new deleted or modified content<br><br>Structure: the combination of a web server, Common Gateway Interface (CGI) program, website database, form and equivalents | Function: identifying, using said web site database, new deleted or modified content<br><br>Structure: (i) a website server or surrogate website server; and (ii) the server algorithm that automatically checks a database representing a historical version of a website against the current version of the website to detect changes, and: (1) marks a resource as new if it is present on a website server but not yet in the website database; (2) marks a resource as deleted if it is listed in the web site database but cannot be retrieved; (3) marks a resource as modified if the date and time of last modification in the web site database for the resource is earlier than the date and time of last modification provided by a web server for the resource; and (4) does not mark any unmodified resources (all as described at 4:56-67 and 9:30-10:25) |
| "a means for transmitting to said internet search engine a set of indices, wherein said set of indices comprises said new, deleted or modified database content" | Function: transmitting to said internet search engine a set of indices, wherein said set of indices comprises new, deleted or modified database content<br><br>Structure: the combination of web server and Common Gateway Interface (CGI) script and equivalents | Function: transmitting to said internet search engine a set of indices, wherein said set of indices comprises new, deleted or modified database content<br><br>**Indefinite:** The patent discloses no structure for "transmitting to said internet search engine a set of indices, wherein said set of indices comprises said new, deleted, or modified database content." Although the specification implies that the |

9

United States District Court
For the Northern District of California

| | | website server or surrogate transmits information relating to a resource to a search engine, the specification does not disclose the function of transmitting a "set of indices" to a search engine, and does not disclose any specific structure that transmits anything to a search engine.

**Structure**: The structure disclosed in the specification that comes closest to performing the claimed function is at most incomplete and does not perform the complete claimed function. Specifically, that disclosed structure is a website server or surrogate website server, which implicitly transmits resources (but not a "set of indices") to the search engine index (as described at 10:42-44). |
|---|---|---|
| "a means for parsing, through the use of said script, said information from said form" | Function: parsing information from a form

Structure: agents (programs that can travel over the internet and access remote resources) and their equivalents | Function: parsing, through the user of said script, said information from said form.

**Indefinite:** The patent discloses no structure for performing the claimed function. Although the specification states that a "web site server or surrogate parses CGI script," the parsing of CGI script is not the same as the parsing of "said information from said form," and the specification fails to identify an algorithm for performing parsing.

**Structure:** The structure disclosed in the specification that comes closest to performing the claimed function is at most incomplete and does not perform the complete claimed function. Specifically, that disclosed structure is: (i) a website server or surrogate website server, which parses CGI script (as shown by Fig. 1b, box 103). |
| "a means for updating, | Function: (agreed to by ALL parties) updating, through the | Function: (agreed to by ALL parties) updating, through the use of said |

United States District Court
For the Northern District of California

| through the use of said script, said database of search engine" | use of said script, said database of search engine.<br><br>Structure: Common Gateway Interface (CGI) program of search engines and equivalents | script, said database of search engine.<br><br>**Indefinite:** The patent discloses no structure for "updating, though the use of said script, said database of search engine." Although the specification does disclose that a search engine executes a particular script to update its database (10:44-11:44; 12:18-13:44; Figs. 3a and 3b), that script is executed by the search engine, and must be different from the script that parses said information from said form, which executes on the website server or surrogate. The specification discloses no script that performs both functions, and thus cannot disclose any structure for executing such a script.<br><br>**Structure:** The structure disclosed in the specification that comes closest to performing the claimed function is at most incomplete and does not perform the complete claimed function. Specifically, that disclosed structure is: (i) a search engine; and (ii) the "register file" CGI script executed by the search engine (as described at 10:39-41 and 10:43-44), that (1) removes entries from the search engine database for files that no longer exist; (2) adds entries to the search engine database for newly registered files; and (3) updates entries in the search engine database for files that have changed (all as described at 10:46-11:44; at 12:18-13:44; and in Figs. 3a and 3b). |

The court construed those terms as follows[43]:

| Term | Court's Constructions |
|------|----------------------|
| "information" | Not construed because of concerns regarding indefiniteness |
| "website database" | Record of resources on the website, other than the resources of the |

---

[43] *See* Docket No. 632 at 153:17 – 157:15.

11

Case No.: 11-3306 PSG
ORDER

| | website themselves |
|---|---|
| "a means for creating and modifying a database of a website where in said website database contains content capable of being indexed by an internet search engine" | Function: Creating and modifying a database of a website wherein said website database contains content capable of being indexed by an internet search engine<br><br>Structure: A website server or surrogate website server; the table of files which is a field in the table of search engines; and the disclosed server algorithm which builds the table of files list containing records that store URL's that are obtained from either a manually entered list, a specified map page, or a spider crawling from specified entry points of the website and modifies records in the table of files list when content is added, altered, or removed |
| "a means for identifying, using said web site database, new, deleted, or modified content" | Function: Identifying, using said website database, new, deleted, or modified content<br><br>Structure: A website server or surrogate website server and the server algorithm that automatically checks the database representing a historical version of a website against a current version of a website to detect changes, and marks a resource as new if it is present on a website server but not yet in the website database; marks a resource as deleted if it is listed in the website database, but cannot be retrieved; marks a resource as modified if the date and time of last modification in the website database for the resource is earlier than the date and time of last modification provided by a web server for the resource, and does not mark any modified, unmodified, resources |
| "a means for transmitting to said internet search engine a set of indices, wherein said set of indices comprises said new, deleted or modified database content" | Not construed because of concerns regarding indefiniteness |
| "a means for parsing, through the use of said script, said information from said form" | Not construed because of concerns regarding indefiniteness |
| "a means for updating, through the use of said script, said database of search engine" | Not construed because of concerns regarding indefiniteness |

Newegg asserts that SUS's position regarding "website database" ignored the specifications, that SUS's positions regarding "means for creating" and "means for identifying" ignored means-plus-function case law, and that SUS should have known that several of its terms

12

Case No.: 11-3306 PSG
ORDER

were indefinite.  Newegg also suggests that SUS's claim construction positions before the Eastern District of Texas were so contrary to means-plus-function law that they also were objectively baseless.

In its discussion of both its constructions and the merit of SUS's arguments, the court keeps in mind the Federal Circuit's guidance regarding claim construction.  "To construe a claim term, the trial court must determine the meaning of any disputed words from the perspective of one of ordinary skill in the pertinent art at the time of filing."[44]  This requires a careful review of the intrinsic record, comprised of the claim terms, written description, and prosecution history of the patent.[45]  While claim terms "are generally given their ordinary and customary meaning," the claims themselves and the context in which the terms appear "provide substantial guidance as to the meaning of particular claim terms."  Indeed, a patent's specification "is always highly relevant to the claim construction analysis."[46]  Claims "must be read in view of the specification, of which they are part."[47]

Although the patent's prosecution history "lacks the clarity of the specification and thus is less useful for claim construction purposes," it "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."[48]  The court also has the discretion to consider extrinsic evidence, including dictionaries, scientific treatises, and testimony from experts and inventors. Such evidence,

---

[44] *Chamberlain Group, Inc. v. Lear Corp.,* 516 F.3d 1331, 1335 (Fed. Cir. 2008).

[45] *Id.*; *Phillips v. AWH Corp,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal citations omitted).

[46] *Phillips,* 415 F.3d at 1312-15.

[47] *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd,* 517 U.S. 370 (1996). *See also Ultimax Cement Mfg. Corp v. CTS Cement Mfg. Corp.*, 587 F. 3d 1339, 1347 (Fed. Cir. 2009).

[48] *Phillips,* 415 F.3d at 1317 (internal quotations omitted).

13

Case No.: 11-3306 PSG
ORDER

however, is "less significant than the intrinsic record in determining the legally operative meaning of claim language."[49]

The court turns now to the terms at issue and the merit of SUS's arguments.

        a.     **"Website Database"**

SUS argued that the "website database" is "simply [a] record of resources on the website" and pointed to the Summary of Invention in the RE'683 Patent.[50]  The Summary of Invention states that "[u]pon initial execution, the software builds a database of the resources on the website" and that "[t]he resources catalogued can be specified by the user, or automatically through spidering function of the software."[51]  The summary further provides that "[t]he database consists of one record per resource indexed on the site."[52]

Newegg[53] argued that SUS's construction was "so vague that it would encompass the website itself" and that Newegg's construction more properly established that the resources on the website are distinct from the website itself.  Newegg also looked to the Summary of Invention, highlighting its description of the database as "consist[ing] of one record per resource indexed on the site" and that "[e]ach record contains fields."[54]

The court construed "website database" as a "record of resources on the website, other than the resources of the website itself."  The court agreed with Newegg's concerns that the website database had to be distinguished from the underlying website to fit within the claims and the

---

[49] *Id.* (internal quotations omitted).

[50] *See* Docket No. 605.

[51] RE'683 Patent at 4:35-39.

[52] *Id.*

[53] The twenty-two remaining defendants filed a joint claim construction brief opposing SUS's constructions, but for convenience, the court refers only to Newegg as maintaining the arguments.

[54] RE'683 Patent at 4:35-40.

Case No.: 11-3306 PSG
ORDER

**United States District Court**
For the Northern District of California

specifications in the RE'683 Patent.[55]  The language of the claim in which "website database" appears requires that any construction of the term include a distinction between the website and the resulting database.  The claim states "a means for creating and modifying a database of a web site wherein said website database," which, in conjunction with the language of the Summary of Invention, supports that the "website database" is separate from the underlying resources on the website itself.[56]  The inventor likewise noted during reexamination that "the process in the . . . invention checks a database representing a historical version of a web site against the current version of the Web site to detect changes."[57]

Although the court added a clause distinguishing the "record of resources" from the "resources on the website itself," it found less support for Newegg's position that the term meant a "structure of fields or records built by software that catalogues the resources of a website."  The Summary of Invention references "fields" in describing the database, but the intrinsic evidence does not support that a person of ordinary skill in the art would consider a "website database" to be limited to a "structure" built by "software that catalogues the resources of a website."  Newegg in fact pointed to no other intrinsic evidence to support the extra language in its construction.[58]

Having now explained the reasoning for its construction, the court cannot say that SUS's position was "objectively baseless."  Its proposed construction, although broadly worded, was not entirely unsupported by the intrinsic evidence.  SUS's construction came from language in the Summary of Invention and is not so problematic that the court finds it was frivolous.  As SUS explained at the hearing, it was concerned that Newegg's construction suggested a "separate and

---

[55] *See* Docket No. 632 at 90:25 – 91:12.

[56] RE'683 Patent at 15:28-29.

[57] *See* Docket No. 607 Ex. 2.

[58] *See* Docket No. 607.

15

Case No.: 11-3306 PSG
ORDER

distinct" database that was not an included limitation in the claim language and that appeared to preclude the website itself from hosting the database.[59]  SUS, however, agreed at the hearing that the "website database" had to be distinct from just the content of the website.[60]

The court in fact adopted its description – "record of resources on the website" – and added the limiting clause in part because of Newegg's concerns.  Newegg argues that because SUS's proposed construction could be read as including the website itself, SUS's position was untenable and baseless.  It is true that SUS's proposal could be read to include the website, which SUS at one point forwarded as an argument[61] and which would in fact contradict the intrinsic evidence, but that interpretation is not the only one.  First, at the hearing, SUS agreed that this interpretation of "website database" or its construction was not supported by the claim or the specification.  Second, although SUS's construction could have swept in the website itself, "record of resources" likewise suggests that the record is separate from the website.  The construction was problematic, but the court cannot say that it was so clearly unsupported by the patent and the specification as to be frivolous.[62]

The types of claim construction positions the Federal Circuit has held to be frivolous are illustrative.  In *Raylon, LLC v. Comoplus Data Innovations, Inc.*, for example, the plaintiff proposed a construction of a "display being pivotally mounted on said housing" to mean "an electronic device attached to a housing for the visual presentation of information, the display capable of being moved or pivoted relative to the viewer's perspective."[63]  Both the figures in the

---

[59] *See* Docket No. 632 at 88:15-18.

[60] *See id.* at 88:19-24.

[61] *See* Docket No. 608.

[62] *See iLOR, LLC v. Google, Inc.*, 631 F3d 1372, 1378-89 (Fed. Cir. 2011) ("The question is whether [the] broader claim construction was so unreasonable that no reasonable litigant could believe it would succeed.").

16

Case No.: 11-3306 PSG
ORDER

patent and the specification described that the screen itself must pivot relative to the machine, not relative to the user.[64] The Federal Circuit held that the plaintiff's position was not just unsupported by the patent but actually contradicted by it.[65] In *Eon-Net LP v. Flagstar Bancorp*, the Federal Circuit agreed with the district court that the patentee's position that the terms "documents" and "files" were not limited to "hard copy documents" was contradicted by the numerous references in the patent to "hard copy documents" as being the essence of the invention at issue.[66] SUS's proposed construction does not reach those levels of speciousness.

### b.   "Means for Creating" and "Means for Identifying"

The parties disputed only the construction of the structures that performed the functions "a means for creating and modifying a database of a website where in said website database contains content capable of being indexed by an internet search engine" and "a means for identifying, using said web site database, new, deleted, or modified content." For the "means for creating" term, SUS sought a construction of the structure as a "combination of a web server, Common Gateway Interface script, website database and form and equivalents." For the "means for identifying" term, SUS sought a nearly identical construction with only a substitution of "script" for "program" in the "Common Gateway Interface" ("CGI") language. SUS supported its constructions with references to the specification. For example, it pointed to language stating that "[i]nstallation of the software tools places a number of CGI scripts, database tables, and HTML forms on the server," and that "[t]he user is provided with an HTML form and CGI script . . . in order to configure the Enabled and Table of Files fields." Relying on these references, SUS asserted that the structure necessary to create the database consisted of a web server, a CGI program, a website database and a form.

---

[63] 700 F.3d 1361, 1365 (Fed. Cir. 2012).

[64] *See id.* at 1368-69.

[65] *See id.* at 1369.

[66] 653 F.3d at 1326.

17

Case No.: 11-3306 PSG
ORDER

Newegg disagreed, asserting that SUS's position improperly referenced only a general purpose computer or general computer functions in violation of the Federal Circuit's requirements under computer-related means-plus-functions claims. Newegg instead asserted that for both "means for creating" and "means for identifying" the proper structure was not only a website server or surrogate website server but also "the Table of Files, which is a filed in the Table of Search Engines . . . [and] the disclosed server algorithm" that builds the Table of Files and modifies the table's records as content is "added, altered, or removed." Newegg argued that only with the addition of the algorithm that explained how the website server and the Table of Files were created and updated could the structure comply with 35 U.S.C. § 112(6).

The court adopted Newegg's construction of the structure for both "means for identifying" and "means for creating." Although the specification described that the user "is provided with an HTML form and CGI script, hereinafter referred to as a CGI program, in order to configure the Enabled and Table of Files fields," the court found this instruction insufficient to describe the requisite structure for means-plus-function claims. Relying in part on Newegg's expert, the court found that the CGI program was a general tool for allowing data to move between a web client, a web server, and different processes on the web server and so it was only a "general purpose computer" requiring an algorithm to meet the Section 112(6) requirement.[67]

The court then looked to the rest of the specification, which describes both the "Table of Files" and the algorithm necessary to create both that table and to update it with changes to the website. That algorithm explains that the CGI program (a combination of the CGI script and the HTML form) "configure[s]" the "Table of Files" through one of three methods: (1) "[t]he user may list all the resources to be registered manually"; (2) "[t]he user may specify a map page"; or (3) "[t]he user may specify entry points to the web site" at which point "the CGI program will enter the

---

[67] *See* Docket No. 607 Ex. 1 at ¶ 16.

18

Case No.: 11-3306 PSG
ORDER

United States District Court
For the Northern District of California

site and spider to all resources referenced on those entry points" and add them to the Table of Files. The court found this description to be the algorithm necessary to describe what steps the CGI program needed to perform to embody both the "means for creating" and the "means for identifying" terms.

Newegg asserts that SUS's proposed constructions for the structures for "means for creating" and for "means for identifying" were so contrary to means-plus-function case law that they were frivolous. Newegg specifically points to SUS's failure to account for the Table of Files within the Table of Search Engines algorithm in its proposed construction, asserting that SUS's position contradicted the patent itself, which, according to Newegg, taught that structure as the heart of the invention. Newegg contends that, combined with its proposed construction of "website database," SUS's arguments for the structures impermissibly sought an interpretation of the patent far broader than the invention the patent actually described.

SUS responds that its position was not frivolous because the combination of a web server, CGI program, website database, and form acts as a "special-purpose computer," which, pursuant to the Federal Circuit's teachings, does not require an algorithm to explain adequately the structure for the means-plus-function claims. According to SUS, the elements of the structure it proposed already contained sufficient programming such that it did not err by not including an algorithm. SUS maintains that this area of law is complicated and subject to dispute and so its position cannot be considered "objectively baseless."

The court begins by considering the law governing means-plus-functions and computer-related patents in particular. Patents may not claim pure functions – they must recite a structure that performs the function the patentee seeks to protect.[68] The claim itself need not describe the structure: "[a]n element in a claim for a combination may be expressed as a means or step for

_____

[68] *See Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1363 (Fed. Cir. 2012).

19

Case No.: 11-3306 PSG
ORDER

performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."[69]   In other words, in exchange for being excused from describing the structure within the claim, the patentee must limit itself to the structures described in the specification.[70]   Failure to describe a structure that can perform the function in either the specification or the claim renders the patent indefinite.[71]

Computer-related inventions present a special situation under means-plus-function law. Because a computer generally cannot perform a particular function without further instructions, identifying a general purpose computer does not satisfy the "structure" requirement for a computer function.[72]   The specification therefore must describe an algorithm that explains the instructions for the computer to satisfy means-plus-function specificity.[73]   In other words, for a computer apparatus claimed in a means-plus-function manner, the claim and the specification must disclose essentially three elements: (1) the function, (2) the part of the computer that can perform the function, and (3) the algorithm that makes the computer perform that particular function.   The last two elements combine to describe a "special purpose computer" programmed to perform the function described in the claim.[74]   The "special purpose computer" thus described satisfies the structure component of a means-plus-function claim.[75]

---

[69] 35 U.S.C. § 112(6).

[70] *See Ergo Licensing*, 673 F.3d at 1363.

[71] *See id.*

[72] *See id.* at 1364; *see also Aristocrat Tech. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) ("Because general purpose computers can be programmed to perform very different tasks in very different ways, simply disclosing a computer as the structure designated to perform a particular function does not limit the scope of the claim to the corresponding structure, material, or acts that perform the function, as required by section 112 paragraph 6.") (internal quotations omitted).

[73] *See Ergo Licensing*, 673 F.3d at 1363; *Aristocrat*, 521 F.3d at 1333.

Case No.: 11-3306 PSG
ORDER

The Federal Circuit also advises that a disclosed algorithm that "supports some, but not all, of the functions associated with a means-plus-function limitation" requires treating the specification "as if no algorithm has been disclosed at all."[76]  An expert's testimony cannot remedy a deficiency in the specification by "supplant[ing] the total absence of structure from the specification."[77]

The Federal Circuit has carved out a limited exception to this requirement that an algorithm must be disclosed.[78]  In situations where the claimed functions can be performed by a general-purpose computer "without special programming," patentees need not "disclose more structure than the general purpose processor that performs those functions."[79]  But "[i]f special programming is required for a general-purpose computer to perform the corresponding claimed function, then the default rule requiring disclosure of an algorithm applies."[80]  "It is only in the rare circumstances where any general-purpose computer without any special programming can perform the function that an algorithm need not be disclosed."[81]

SUS did not argue at claim construction that the structure it proffered was a "general-purpose computer" that could perform the claimed functions without additional programming. SUS instead argued that the combination of the website server, CGI program, website database,

---

[74] *See Aristocrat*, 521 F.3d at 1333.

[75] *See id.*

[76] *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1318 (Fed. Cir. 2012).

[77] *Default Proof Credit Card Sys. V. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1302 (Fed. Cir. 2005); *see also Noah*, 675 F.3d at 1318.

[78] *See In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011); *see also Ergo*, 673 F.3d at 1364-65 (noting that *Katz* "identified a narrow exception to the requirement that an algorithm must be disclosed for a general-purpose computer to satisfy the disclosure requirement").

[79] *Katz*, 639 F.3d at 1316.

[80] *Ergo*, 673 F.3d at 1365.

[81] *Id.*

21

Case No.: 11-3306 PSG
ORDER

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

and form is a "special-purpose computer" that does not require an additional algorithm.  To support this argument, SUS compared the functions courts have identified "special purpose computers" capable of performing and functions associated with "general purpose computers" and argued that the functions that the CGI program and the web server performed make them "special purpose computers."

Typically, a "special purpose computer" is "what a general purpose computer becomes when an appropriate algorithm is used."[82]  It is possible, however, for a structure known by a person with ordinary skill in the art as a special purpose computer to be identified in the specification without any further algorithm.[83]  SUS took that premise – that a computer-like structure known to perform in a particular way can stand alone as a "special purpose computer" – and argued that a structure that can perform in a manner beyond general processing without additional programming qualifies as a "special purpose computer" that does not require an algorithm.

SUS misunderstood the Federal Circuit's guidance both during claim construction and again here in its defense to this opposition.  A structure can qualify as a stand-alone "special purpose computer" only because a person with ordinary skill in the art knows it can perform in essentially one way and that one way performs the claimed function.[84]  The structure therefore is sufficiently specific to qualify under Section 112(6).  Underlying the Federal Circuit's guidance in this area is that the trade-off for means-plus-function claims is a sufficiently specific structure identified in the specification.  An algorithm explaining how a computer that is able to perform

---

[82] *Goss Intern. Am., Inc. v. Graphic Mgmt. Assoc., Inc.*, 739 F. Supp. 2d 1089, 1100 (N.D. Ill. 2010).

[83] *See id.* (finding that a "controller" is a "known structure that is a type of special purpose computer" as defined by extrinsic sources and so it did not need an algorithm).

[84] *See, e.g., id.*

22

Case No.: 11-3306 PSG
ORDER

generalized functions can perform the specific function claimed in the patent respects that trade-off.

Here, SUS argued that because the web server "receives requests in HTTP, HTTPS, or a similar standardized web protocol," "generates responses to those requests," "[uses] CGI scripts . . . to pass data between different processes running on the web server," and "passes data between a web server and web client," the web server was a "special purpose computer" when combined with the other structures in its construction.[85]  None of those functions, however, include creating or modifying a website database or identifying changes in the website by using the website database. The structures required an algorithm to reach the level of specificity required under Section 112(6).

Although the court disagreed that the combination of a CGI program, a web server, a website database, and a form constituted a special purpose computer, SUS's position was not entirely frivolous.  As the court's lengthy discussion of this area of law makes clear, the Federal Circuit and district courts have created a complicated framework from which to determine whether a particular computer-related structure does or does not satisfy Section 112(6).  SUS's argument overlooks a nuance in the Federal Circuit's case law – namely that the functions the court has identified in its computer-related means-plus-function opinions do not on their own transform general purpose computers into special purpose computers.  But given the disputes within the Federal Circuit regarding this area of law,[86] the court cannot say that SUS's argument is objectively baseless or frivolous.

### c.    Indefiniteness

For its third argument, Newegg contends that SUS should have realized that several of the terms in claim 8 were indefinite and so should have avoided pursuing its case.  It primarily points

---

[85] *See* Docket No. 608 (quoting the defendants' expert's report); *see also* Docket No. 607 Ex. 1.

[86] *See Ergo*, 673 F.3d at 1365 (Newman, J., dissenting) (noting that the court "again, irregularly and unpredictably, departs from the established protocols of claim drafting").

23

Case No.: 11-3306 PSG
ORDER

to the three means-plus-function terms that the court declined to construe on indefiniteness grounds.[87]   According to Newegg, the terms were so obviously indefinite that SUS's pursuit of infringement causes of action was objectively baseless.  SUS responds that, as with the constructions of "means for creating" and "means for identifying," at least three of the terms could be construed as requiring only the CGI script, web server, website database, and form structures.

The three terms – "a means for transmitting to said internet search engine a set of indices, wherein said set of indices comprises said new, deleted or modified database content," "a means for parsing, through the use of said script, said information from said form," and "a means for updating, through the use of said script, said database of search engine" – were indisputably means-plus-function terms that required a sufficiently specific structure to be identified in the specification.[88]   SUS offered the same structure for these three terms as it did for the "means for identifying" and "means for creating" terms.  As the court already has explained, that structure on its own is insufficient to satisfy the requirements of Section 112(6).  But unlike "means for creating" and "means for identifying," the specification lacked the necessary algorithms to explain how the CGI scripts, web server, website database, and form would perform the claimed functions.  The court thus found that the three terms likely were indefinite and so declined to construe them.

The court has explained at length its reasons for why SUS's position regarding the structure for the means-plus-function terms was not objectively baseless.  Newegg's arguments about the three indefinite means-plus-function terms mirror its earlier argument, and so the court adopts that reasoning here.  SUS's position relied on an incorrect but not objectively baseless interpretation of

---

[87] Newegg also includes a reference to "information," which the court also declined to construe on indefiniteness grounds.  Because Newegg provides no further argument about this term than to include it in the description of terms the court found indefinite, the court does not address SUS's position.

[88] *See* 35 U.S.C. § 112(6).

24

Case No.: 11-3306 PSG
ORDER

computer-related means-plus-function law.  The court further finds that the terms were not so obviously indefinite that SUS's pursuit of infringement causes of action on claim 8 was frivolous.

### d.      Eastern District of Texas Claim Construction Positions

Newegg also offers SUS's claim construction positions before the Eastern District of Texas as evidence that SUS's causes of action were objectively baseless.  Before the case was transferred to this court, the parties prepared for claim construction while the defendants' motion for transfer was pending.  The Eastern District of Texas transferred the case before it performed claim construction, and so the parties prepared new claim construction briefs pursuant to this court's case management order.  Newegg asserts that SUS's positions in the earlier claim construction preparation were so egregious as to warrant an objectively baseless finding.

In its first claim construction papers, SUS asserted that the structure for the six means-plus-function terms in claim 8 could be satisfied with only a CGI script and further maintained that the CGI script was only an "exemplary structure."[89]  Newegg contends that these positions were even more egregious arguments in light of the means-plus-function law that the court described above. SUS admits that after considering the defendants' opposition in their original briefing, it revised its positions to add more structure in the means-plus-function constructions.

The court agrees with Newegg that SUS's positions in the Eastern District of Texas represent worse arguments than its proposed constructions before this court.  Had SUS maintained those positions in the second claim construction, the court likely would find that SUS's arguments were frivolous.  But the court cannot say that SUS's highly problematic position in an opening brief to a claim construction is sufficient, on its own, to warrant a finding of objective baselessness. SUS had no opportunity to file a reply in the first claim construction, and it amended its proposals in the claim construction in this court.  SUS thus attempted to correct the defects the defendants

---

[89] *See* Docket No. 494.

Case No.: 11-3306 PSG
ORDER

identified.[90]   And so, even if the court were to find that SUS's claim construction proposals before the Eastern District of Texas were objectively baseless, SUS's attempts to amend them do not reveal subjective bad-faith.   Newegg has not shown by clear and convincing evidence that this is an exceptional case on these grounds.

### 2.   Subjective Bad Faith

Although the court has found that SUS's positions were not objectively baseless, it nevertheless addresses Newegg's arguments regarding subjective bad faith.   Relying on *Eon-Net LP v. Flagstar Bancorp*,[91] Newegg points to SUS's settlement conduct, specifically that SUS settled early with several defendants for amounts that Newegg asserts reflect SUS's goal of obtaining nuisance settlements.   To support that argument, Newegg presents SUS's offers to it during litigation as well as nine settlement agreements with other defendants in the action.

Those nine settlement agreements Newegg submitted reveal that the amounts ranged from ███████████████████ with all but two of the settlements within a five-figure range.[92]   The settlements took place between October 2010 and June 2011.[93]   Newegg also points to SUS's conduct with respect to its settlement offers to Newegg.   In July 2010, SUS offered to settle the case with Newegg for ████████ and then in April 2012 dropped the amount of the offer to ██████.[94]   According to Newegg, SUS's settlement conduct mirrors the patentee in *Eon-Net*, and so the court should find SUS acted with subjective bad faith.

---

[90] *See Raylon*, 700 F.3d at 1365 (noting patentee maintained objectively baseless claim construction position even after warning from defendants that the construction was entirely erroneous); *Highmark*, 687 F.3d at 1312 (describing patentee's early agreement that preamble limited claim but then later claim construction in contradiction of the preamble).

[91] 653 F.3d at 1327.

[92] *See* Docket No. 649 Exs. 6 – 14.

[93] *See id.*

[94] *See* Docket No. 649 Ex. 4 at ¶ 15, Ex. 18.

26

Case No.: 11-3306 PSG
ORDER

To underscore its theory that SUS was entirely bent on extracting settlements from noninfringing defendants based on little more than the crushing costs of defense in even the simplest patent case, Newegg highlights the relationship between SUS and its parent corporation Acacia Research Corporation ("Acacia").  According to Newegg, Acacia has a "pattern" of extortionate litigation tactics, including parallel cases between Acacia subsidiaries Adjustacam LLC ("Adjustacam") and Digitech Images Technologies, LLC ("Digitech") and Newegg.  Newegg asserts that Adjustacam decided to drop its claims against Newegg in the parallel case and that, as with this case, Acacia played a substantial role in settlement talks involving both of its subsidiaries.  These actions, Newegg asserts, reveal that Acacia is the real problem, and that the actions of Acacia and its subsidiaries in the various actions should serve as evidence of SUS's bad faith here.

SUS responds that at least one of its settlement agreements was for $450,000, which it asserts belies that the agreements were for nuisance values.  It also asserts that unlike in *Eon-Net*, where the patentee used defendants' annual sales to determine appropriate settlement amounts, SUS's valuation resulted from its assessment of "URL count, with flexibility given if the accused functionality was less important to the business, including in consideration of feedback from defendants, ALEXA ratings, how many visitors reached the site from search engine searches, and how many visitors are from the U.S."[95]  In response to Newegg's claims about Acacia, SUS highlights that Newegg has not moved to include Acacia in this case under an alter-ego theory and that Newegg's claims amount to nothing more than bald assertions.

In *Eon-Net*, the Federal Circuit affirmed the district court's exceptional case finding where the patentee, a non-practicing entity, and its related entities "had filed over 100 lawsuits against a number of diverse defendants alleging infringement of one or more patents" and followed the

---

[95] Docket No. 654; *see also* Docket No. 654 Ex. 4.

27

complaints with "a demand for a quick settlement at a price far lower than the cost of litigation."[96] Noting the expense of pursuing a case through claim construction, which is the first opportunity that a court can ascertain the merit of the underlying claims, the Federal Circuit explained that "low settlement offers . . . effectively ensure[] that [the patentee's] baseless infringement allegations remain[] unexposed."[97]  Such requests for low settlement amounts, when combined with meritless infringement claims, thus can support a court's determination that the patentee brought the case in subjective bad faith.[98]

As described at length above, the court does not find that SUS's positions in this case were objectively baseless.  Because SUS's argument is not frivolous – because it is only a losing argument – the court cannot say that SUS's settlements with the defendants for amounts below the cost of defense are, by themselves, enough to warrant a finding of subjective bad faith.  Patentees with meritorious arguments can seek settlements far below the cost of defense, especially if they do not want to spend significant amounts of money to protect their patents.  SUS's settlement pattern raises some eyebrows but because its positions were not entirely baseless, its attempts to settle claims early in the litigation for costs lower than the amounts of a defense are not sufficient, alone, to find subjective bad faith.

The court also briefly addresses Newegg's references to Acacia, Digitech, and Adjustacam in support of its exceptional case argument here.  In *Eon-Net*, the Federal Circuit pointed to the patentee's "related entities" and their pattern of filing numerous lawsuits against "diverse defendants" followed by a "demand for a quick settlement at a price far lower than the cost of

---

[96] 653 F.3d at 1326.

[97] *Id.* at 1327.

[98] *See id.*

28

Case No.: 11-3306 PSG
ORDER

litigation."[99]  Presumably following the Federal Circuit's lead, Newegg presents the parallel

litigations with Digitech and Adjustacam and their relationship to SUS and Acacia in support of its

argument.

Although the Federal Circuit appears to condone consideration of actions in other cases as a

way to justify an exceptional case finding, the court also looks to the Supreme Court's direction in

*State Farm v. Campbell*.  In holding a punitive damages award violated the defendant's Due

Process rights, the Court opined that a defendant "should be punished for the conduct that harmed

the plaintiff, not for being an unsavory individual or business."[100]  "Due process does not permit

courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical

claims against a defendant under the guise of the reprehensibility analysis" that is required in a

punitive damages assessment.[101]  The Court further observed although "a recidivist may be

punished more severely than a first offender" because "repeated misconduct is more reprehensible

than an individual instance of malfeasance," "in the context of civil actions courts must ensure the

conduct in question replicates the prior transgressions."[102]

The court finds that reasoning in *State Farm* has equal application in the exceptional case

analysis, specifically that Newegg must show that SUS engaged in repeated conduct that also

harmed Newegg.  Here, Newegg offers the complaint Adjustacam filed against Newegg and

numerous other defendants and a declaration stating that Adjustacam offered to settle for a five-

figure amount.[103]  Newegg also offers screen shots of Acacia's websites purportedly to show that

Acacia and SUS are related because Acacia announced the settlement between SUS and Red Hat

---

[99] *Id.* at 1327.

[100] 538 U.S. 408, 423 (2003).

[101] *Id.*

[102] *Id.*

[103] *See* Docket No. 649 Exs. 2, 3.

Case No.: 11-3306 PSG
ORDER

and because the officers who signed on behalf of SUS also serve as executives at Acacia.[104]  Even

if this evidence is sufficient to show that Acacia and SUS are related, it is not enough to show the

relationship between Acacia and Adjustacam or between SUS and Adjustacam.  Newegg offers

nothing to connect Digitech to any of the other entities.

Even if the court presumes the entities are all related, settlement offers for small amounts

are not the injury that Newegg claims to suffer at SUS's hands.  It is the defense against a frivolous

claim in light of the lure of a small settlement offer that *Eon-Net* identified as a harm warranting an

exceptional case finding.  Newegg offers nothing in its disputes with either Adjustacam or Digitech

that suggests their positions were objectively baseless.   And if the court considers bad faith actions

in other cases as justification for a finding of subjective bad faith in this case, it runs the risk of

duplicating an assessment of attorneys' fees against a losing party by awarding attorneys' fees in

this case for actions taken in the other cases.[105]  Given those concerns, the court does not address

further Newegg's arguments regarding Acacia, Adjustacam, and Digitech.

**B.      Litigation Misconduct**

Newegg offers two other examples of SUS's conduct that it believes supports a finding that

this case is exceptional.  While the case was still in the Eastern District of Texas, SUS opposed the

defendants' motion to transfer the case to the Northern District of California.[106]  Newegg asserts

that the opposition was frivolous because it was only two pages and because SUS concluded its

brief argument by stating that it was "agreeable to the transfer if the Court deems that such transfer

is in the interests of justice of all parties."[107]  Newegg also points to SUS's initial failure to include

---

[104] *See id.* Exs. O, Q, R, T.

[105] *See State Farm*, 538 U.S. at 423 (noting that consideration of "hypothetical claims" "creates the possibility of multiple punitive damages awards for the same conduct").

[106] *See* Docket No. 410.
[107] *Id.*

Case No.: 11-3306 PSG
ORDER

United States District Court
For the Northern District of California

Acacia and its other subsidiaries in its initial offer of a covenant not to sue following the claim construction.  Newegg offers these actions as further evidence of SUS's bad faith in this action.

Litigation misconduct "generally involves unethical or unprofessional conduct by a party or his attorneys during the course of adjudicative proceedings, and includes advancing frivolous arguments during the course of litigation or otherwise prolonging litigation in bad faith."[108]  The court finds that neither of the actions Newegg offers meets this standard.

In opposing the defendants' motion to change venue to this district, SUS noted that not all of the defendants had joined the motion, which could result in duplicative proceedings.  SUS also argued that the Eastern District of Texas had a shorter average complaint-to-trial timespan than the Northern District of California.  The court notes that at least two defendants agreed to join the motion to change venue only after SUS filed its opposition[109] and that the Eastern District of Texas had entered a scheduling order before the defendants filed their motion.[110]  Given these factors, the court cannot say that SUS frivolously opposed the motion to transfer the case to this district.

The covenant not to sue ("CNS") issue likewise does not amount to bad faith conduct on SUS's part.  Following the court's claim construction, SUS apparently agreed to dismiss its claims against Newegg and offered a CNS for infringement resulting from Newegg's website as it existed at the time of the covenant or for any past versions in exchange for Newegg's dismissal of its counterclaims of invalidity.  Newegg claims that it insisted on a covenant that included all future versions of the website as well.  SUS asserts that Newegg in fact asked for a global covenant not to sue including not only SUS but also Acacia and other subsidiaries.  Either way, SUS refused to provide a version of the covenant that satisfied Newegg and instead sought to divest the court of its

---

[108] *Highmark*, 687 F.3d at 1315-16.

[109] *See* Docket Nos. 417, 424.

[110] *See* Docket Nos. 362, 363, 364, 365.

31

Case No.: 11-3306 PSG
ORDER

United States District Court
For the Northern District of California

subject matter jurisdiction over the case by moving to dismiss the case and offering Newegg its

covenant not to sue addressing only current and past versions of the site.[111]  Newegg opposed on

the grounds that the covenant was not sufficient to prevent an ongoing controversy because

Newegg's site changes daily.[112]  Following Newegg's opposition, SUS offered the amended

covenant and the parties stipulated to dismiss all claims.[113]

Given that Newegg concedes it was engaged in discussions with Acacia for a global

resolution,[114] the court does not agree with its contention that SUS is misrepresenting Newegg's

position on a global CNS.  Nevertheless, to the extent that the global settlement discussions broke

down and the parties attempted to resolve only the CNS relevant to this case, the court again finds

SUS's position not objectively baseless.

To divest a court of its jurisdiction, a patentee is obligated to provide a CNS that removes

"immediacy and reality from the declaratory action."[115]  From its review of the potential CNS, the

court cannot say that there is no way that SUS could assert that it divested the court's jurisdiction

by removing the requisite case or controversy requirement.  To be sure, Newegg's assertion that its

ongoing changes of its website created an ongoing controversy is also a plausible argument, but

SUS likewise could have argued that because those changes were sufficiently minimal, Newegg's

concerns involved nothing more than the "residual possibility of a future infringement suit based

on [] future acts [that] is simply too speculative."[116]  The court engages no further in debating the

points the parties could have made in support of an order that never came to pass.  It resolves the

---

[111] *See* Docket No. 642.

[112] *See* Docket No. 645.

[113] *See* Docket Nos. 646, 647.

[114] *See* Docket No. 649.

[115] *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 556 F.3d 1294, 1298 (Fed. Cir. 2009) (quoting *Benitec Austl., Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1346 (Fed. Cir. 2007)).

[116] *Id.*

Case No.: 11-3306 PSG
ORDER

United States District Court
For the Northern District of California

issue only with the point that both sides had legitimate arguments and so SUS's position did not amount to litigation misconduct.

## IV.   CONCLUSION

Having completed its meta-analysis not only of the parties' claim construction positions but indeed of several other positions taken in this case, the court finds that this case is not exceptional and so does not warrant an award of attorneys' fees to Newegg.  SUS may have been on the losing side of several arguments, but losing is not enough to warrant a finding of objective baselessness and also subjective bad faith.  Newegg's motion is DENIED.

**IT IS SO ORDERED.**

Dated:  May 21, 2013

_Paul S. Grewal_
PAUL S. GREWAL
United States Magistrate Judge

Case No.: 11-3306 PSG
ORDER